**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>    MF GLOBAL HOLDINGS LTD., *et al.*,<br><br>                   Debtors. | **FOR PUBLICATION**<br><br>Chapter 11<br><br>Case No. 11-15059 (MG)<br><br>(Jointly Administered) |
| MF GLOBAL HOLDINGS LTD., as Plan Administrator,<br><br>                 Plaintiffs,<br><br>       vs.<br><br>WILLIAM K. HARRINGTON, in his official capacity as United States Trustee for Region 2; CLIFFORD J. WHITE III, in his official capacity as Director of the United States Trustee Program; and the UNITED STATES TRUSTEE PROGRAM,<br><br>                Defendants. | Adv. Pro. Case No. 19-01379 (MG) |
| In re:<br><br>    SUNEDISON, INC., *et al.*,<br><br>                 Debtors. | Chapter 11<br><br>Case No. 16-10992 (SMB)<br><br>(Jointly Administered) |
| SUNEDISON, INC., *et al.*,<br><br>                 Plaintiff,<br><br>       vs.<br><br>UNITED STATES OF AMERICA,<br><br>                Defendant. | Adv. Pro. Case No. 19-01443 (SMB) |

## MEMORANDUM OPINION RESOLVING
## <u>CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>

*A P P E A R A N C E S:*

JONES DAY
*Attorneys for the Plaintiffs and MF Global Holdings Ltd.,*
*as Plan Administrator*
51 Louisiana Avenue, N.W.
Washington, DC 20001
By:    Christopher DiPompeo, Esq.
         -and-
250 Vesey Street
New York, NY 10281
By:    Bruce Bennett, Esq.
         Jane Rue Wittstein, Esq.
         Furqaan Siddiqui, Esq.


AKERMAN LLP
*Attorneys for the Plaintiffs and SunEdison, Inc.,*
*as Reorganized Debtors*
2001 Ross Avenue, Suite 3600
Dallas, TX 75201
By:    David W. Parham, Esq. (*Admitted Pro Hac Vice*)
         -and-
420 South Orange Avenue, Suite 1200
Orlando, FL 32801
By:    Esther A. McKean, Esq. (*Admitted Pro Hac Vice*)
         -and-
666 Fifth Avenue, 20th Floor
New York, NY 10103
BY:    John P. Campo, Esq.


DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR UNITED STATES TRUSTEES
*Attorneys for the Defendants*
441 G Street, N.W., Suite 6150
Washington, DC 20530
By:    Wendy Cox, Esq. (*Admitted Pro Hac Vice*)
         Ramona D. Elliott, Esq.
         P. Matthew Sutko, Esq.
         Beth A. Levene, Esq.
         Melanie D. Hendry, Esq.
         Sumi Sakata, Esq.

DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
*Attorneys for the Defendants*
201 Varick Street, Room 1006
New York, NY 10014
By:    William K. Harrington, Esq.
        Linda A. Riffkin, Esq.
        Benjamin J. Higgins, Esq.
        Brian Masumoto, Esq.
        Andrew Velez-Rivera, Esq.

GEOFFREY S. BERMAN
UNITED STATES ATTORNEY FOR THE
SOUTHERN DISTRICT OF NEW YORK
*Attorneys for the Defendants*
86 Chambers Street, 3rd Floor
New York, NY 10007
By:    Peter Aronoff, Esq.
        Talia Kraemer, Esq.

**STUART M. BERNSTEIN and MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGES**

## I.    <u>INTRODUCTION</u>[1]

This joint opinion addresses common issues of fact and law raised by the *Cross-Motions for Summary Judgment* (together, the "Motions") in two separate Adversary Proceedings—one pending before Judge Bernstein and the other pending before Judge Glenn.  The two Adversary Proceedings were commenced in connection with the two separate post-confirmation, chapter 11 cases of SunEdison, Inc. and MF Global Holdings Ltd. (together, the "Plaintiffs").  The Defendants in these Adversary Proceedings are, for all intents and purposes, the same, and the briefs and arguments relating to the Motions are substantially the same.  The MF Global plaintiffs have filed a joinder to the SunEdison plaintiffs' summary judgment briefings, and the defendants named by MF Global have filed a joinder to the summary judgment briefings

---

[1]    Capitalized terms in the Introduction are defined below.

submitted by the defendants named by SunEdison.  Because of the common facts, issues,

arguments and parties, we decide the common issues together.  To be clear, however, while we

reach the same resolution of the Motions, this Joint Opinion reflects the separate opinion of the

each of us in our respective Adversary Proceedings.  *See In re Nat'l Bank of Anguilla (Private*

*Banking Tr.) Ltd.*, 580 B.R. 64, 69 (Bankr. S.D.N.Y. 2018).

　　　The dispute centers on the increase in quarterly fees payable to the United States Trustee

("UST") under amended 28 U.S.C. § 1930(a)(6)(B).  As described below, the increased fees are

designed primarily to support the UST Program.  They became effective for the quarter

beginning January 1, 2018 and, the UST maintains, apply to pending cases, including those

commenced by the Plaintiffs.  The Plaintiffs argue that the increased fees are unconstitutional on

various grounds and they are only liable for the pre-amendment, quarterly fee amounts

applicable on the effective dates of their respective chapter 11 plans.  The UST counters that the

amended quarterly fee amounts are constitutionally permissible and the Plaintiffs must pay those

fees.  For the reasons discussed below, we conclude that the Defendants' motions for summary

judgment should be **GRANTED** and the Plaintiffs' motions for summary judgment should be

**DENIED**:  the quarterly fees payable pursuant to 28 U.S.C. § 1930(a)(6), as amended, are

constitutional.

　　　Particularly in light of the split in bankruptcy court decisions addressing these important

issues that require a uniform result, whatever is decided here is certainly not going to be the last

word on the issues.  Therefore, we certify the decisions herein for immediate appeal to the

United States Court of Appeals for the Second Circuit pursuant to 28 U.S.C. § 158(d)(2)(A)(i)

and (ii).

4

## II.   BACKGROUND

### A.   MF Global's Chapter 11 Cases

Beginning on October 31, 2011 (the "MFG Petition Date"), MF Global Holdings Ltd. ("Holdings Ltd.") and certain affiliates[2] (collectively, the "MF Global Debtors" or "MF Global") filed voluntary chapter 11 bankruptcy petitions.[3]  ("MFG Facts," ECF Doc. # 15 ¶ 1.)[4]  The MF Global Debtors' cases are jointly administered under Case No. 11-15059 (MG) ("MFG Main Case") pursuant to Federal Rule of Bankruptcy Procedure 1015(b).  (*Id.* ¶ 4 (citing MFG Main Case, ECF Doc. ## 19, 298, 528).)

On April 5, 2013, the Court confirmed MF Global's joint plan of liquidation (the "MFG Plan") and the MFG Plan became effective on June 4, 2013 (the "MFG Effective Date").  (MFG Facts ¶¶ 11, 13.)  As of the MFG Effective Date, Holdings Ltd. became the Plan Administrator under the MFG Plan.  (*Id.* ¶ 14.)  Although MF Global's cases were consolidated for administrative purposes, the MFG Plan acknowledged that "the Plan constitutes a separate chapter 11 plan of liquidation for each Debtor."  (*Id.* ¶¶ 7, 16.)

The MFG Plan provided that the Plan Administrator would pay quarterly fees to the United States Trustee Program (the "UST Program") under 28 U.S.C. § 1930 for each MF Global Debtor's estate until the closing of the applicable chapter 11 case pursuant to section

---

[2]     "MF Global's affiliates" refers to MF Global Finance USA Inc.; MF Global Capital LLC; MF Global FX Clear LLC; MF Global Market Services LLC; and MF Global Holdings USA Inc.

[3]     On October 31, 2011, the Securities Investor Protection Corporation commenced an action in the United States District Court for the Southern District of New York against MF Global, Inc. ("MFGI") under the Securities Investor Protection Act, as amended, 15 U.S.C. § 78aaa, *et seq.* ("SIPA").  *Sec. Inv. Prot. Corp. v. MF Global, Inc.*, 11 Civ. 7750 (S.D.N.Y. Oct. 31, 2011) (PAE).  MFGI was a registered broker-dealer owned by MF Global Holdings Ltd.  As provided in SIPA, after the district court granted relief in the SIPA case, the MFGI case was removed from the district court to the bankruptcy court and assigned to Judge Glenn.

[4]     Unless otherwise provided, all citations to documents filed by Plaintiff MF Global or Defendant United States Trustee in the adversary proceeding commenced by MF Global will be to Case No. 19-01379 (MG).

350(a) of the Bankruptcy Code.  (*Id.* ¶ 19 (citing MFG Main Case, ECF Doc. # 1382 at Art. II.A.5).)

### B.     SunEdison's Chapter 11 Cases

Beginning on April 21, 2016 (the "SUNE Petition Date"), SunEdison, Inc. ("SunEdison") and certain affiliates[5] (collectively, the "SunEdison Debtors" or "SunEdison") filed voluntary chapter 11 bankruptcy petitions.  ("SUNE Facts," ECF Doc. # 16 ¶ 2.)[6]  The SunEdison Debtors' cases are jointly administered under Case No. 16-10992 (SMB) ("SUNE Main Case") pursuant to Federal Rule of Bankruptcy Procedure 1015(b).  (*Id.* ¶ 3 (citing SUNE Main Case, ECF Doc. # 66).)

On July 28, 2017, the Court confirmed the SunEdison Debtors' joint plan of liquidation (the "SUNE Plan") which became effective on December 29, 2017 (the "SUNE Effective Date"). (*Id.* ¶¶ 10, 15.)  Although the SunEdison Debtors' cases were consolidated for administrative purposes, each SunEdison Debtor's estate was separately preserved in the SUNE Plan, with each SunEdison Debtor's creditors being provided for in the SUNE Plan.  (*Id.* ¶ 11.)  Pursuant to the SUNE Plan, "[t]he Reorganized Debtors shall continue to pay fees pursuant to [28 U.S.C. §

---

[5]      "SunEdison's affiliates" refers to SunEdison DG, LLC; SUNE Wind Holdings, Inc.; SUNE Hawaii Solar Holdings, LLC; First Wind Solar Portfolio, LLC; First Wind California Holdings, LLC; SunEdison Holdings Corporation; SunEdison Utility Holdings, Inc.; SunEdison International, Inc.; SUNE ML 1, LLC; MEMC Pasadena, Inc.; Solaicx; SunEdison Contracting, LLC; NVT, LLC; NVT Licenses, LLC; Team-Solar, Inc.; SunEdison Canada, LLC; Enflex Corporation; Fotowatio Renewable Ventures, Inc.; Silver Ridge Power Holdings, LLC; SunEdison International, LLC; Sun Edison LLC; SunEdison Products Singapore Pte. Ltd.; SunEdison Residential Services, LLC; PVT Solar, Inc.; SEV Merger Sub Inc.; Sunflower Renewable Holdings 1, LLC; Blue Sky West Capital, LLC; First Wind Oakfield Portfolio, LLC; First Wind Panhandle Holdings III, LLC; DSP Renewables, LLC; Hancock Renewables Holdings, LLC; Buckthorn Renewables Holdings, LLC; Greenmountain Wind Holdings, LLC; Rattlesnake Flat Holdings, LLC; Somerset Wind Holdings, LLC; SunE Waiawa Holdings, LLC; SunE MN Development, LLC; SunE MN Development Holdings, LLC; SunE Minnesota Holdings, LLC; Terraform Private Holdings, LLC; SunEdison Products, LLC; Hudson Energy Solar Corporation; SunE REIT-D PR, LLC; First Wind Energy, LLC; First Wind Holdings, LLC; Vaughn Wind, LLC; Maine Wind Holdings, LLC; SunEdison International Construction, LLC; and EchoFirst Finance Co., LLC.  (SUNE Facts ¶ 2 n.2.)

[6]      Unless otherwise provided, all citations to documents filed by Plaintiff SunEdison or Defendant UST in the adversary proceeding commenced by SunEdison will be to Case No. 19-01443 (SMB).

1930] until the Chapter 11 Cases are closed by entry of the Final Decree." (*Id.* ¶ 18 (quoting

SUNE Plan, SUNE Main Case, ECF Doc. # 3735 at Art. XIV § 14.2)).)  On the SUNE Effective

Date, the SunEdison Debtors transferred certain assets to the GUC/Litigation Trust for the

benefit of holders of general unsecured claims (*id.* ¶ 16), and began operating as Reorganized

Debtors.  (*Id.* ¶ 4.)

       **C.**      **The Pre-Amendment UST Program Quarterly Fees**

       The UST Program, described below, operates in eighty-eight of the ninety-four districts

that comprise the federal judicial system ("UST Districts").  The remaining six districts—located

in Alabama and North Carolina ("BA Districts")—are administered by a Bankruptcy

Administrator ("BA") who is overseen by the Judiciary.  Pursuant to 28 U.S.C. § 1930(a)(6),

chapter 11 debtors in UST Districts must pay quarterly fees based on their quarterly

disbursements until their cases are converted or dismissed.  At the time that the Plaintiffs filed

their chapter 11 cases and confirmed their plans, the following quarterly fee schedule ("Pre-

Amendment Schedule" or "Pre-Amendment Fees") was in effect:

| Quarterly Disbursement Range | Quarterly Fee |
|---|---|
| $0 to $14,999.99 | $325 |
| $15,000 to $74,999.99 | $650 |
| $75,000 to $149,999.99 | $975 |
| $150,000 to $224,999.99 | $1,625 |
| $225,000 to $299,999.99 | $1,950 |
| $300,000 to $999,999.99 | $4,875 |
| $1,000,000 to $1,999,999.99 | $6,500 |
| $2,000,000 to $2,999,999.99 | $9,750 |
| $3,000,000 to $4,999,999.99 | $10,400 |
| $5,000,000 to $14,999,999.99 | $13,000 |
| $15,000,000 to $29,999,99.99 | $20,000 |
| $30,000,000 or more | $30,000 |

(MFG Facts ¶ 21.)  Thus, the maximum quarterly fee per debtor was capped at $30,000 and only

applied to disbursements of $30 million or more.  (*Id.* ¶ 29.)

7

**D.    Congress Increases the Quarterly Fees Payable to the UST Program Under 28 U.S.C. § 1930(a)(6)**

For reasons described below, on October 26, 2017, Congress enacted and the President signed the Bankruptcy Judgeship Act of 2017 ("2017 Act"), Pub. L. No. 115-72.[7]  Section 1004(a) of the 2017 Act amended 28 U.S.C. § 1930(a)(6) to increase the quarterly fees that chapter 11 debtors were required to pay (the "2017 Amendment").  Section 1930(a)(6)(B), as amended, provides:

> During each of the fiscal years 2018 through 2022, if the balance in the United States Trustee System Fund as of September 30 of the most recent full fiscal year is less than $200,000,000, the quarterly fees payable for the quarter in which disbursements equal or exceed $1,000,000 shall be the lesser of 1 percent of such disbursements or $250,000.

28 U.S.C. § 1930(a)(6)(B).  The 2017 Amendment applied "to quarterly fees payable under section 1930(a)(6) . . . for disbursements in any calendar quarter that begins on or after the date of the enactment of this Act."  2017 Act § 1004(c).  Congress directed that two percent of quarterly fees paid under section 1930(a)(6) would be deposited in the general fund of Treasury to offset the cost of eighteen temporary bankruptcy judgeships.  *See id.* § 1004(b)(2); SUNE Facts ¶ 48.)

Under the UST's interpretation of the reach of the 2017 Amendment, the quarterly fees payable by the Plaintiffs increased significantly.  The maximum quarterly fee payable by chapter 11 debtors under the Pre-Amendment Schedule was $30,000, but only if the debtor disbursed $30 million or more during the quarter.  The maximum under the 2017 Amendment is the lesser of 1% of the disbursements or $250,000 per calendar quarter, and the maximum kicks in if the debtor makes disbursements of $1 million or more.  The following table compares the quarterly

---

[7]    The 2017 Act is contained in the Additional Supplemental Appropriations for Disaster Relief Requirements Act of 2017, Pub. L. 115-72, as Division B.  131 Stat. 1229-34.

8

fees SunEdison paid or should have paid under the 2017 Amendment with the amounts it would

have paid under the Pre-Amendment Schedule for calendar years 2018 and part of 2019:

| Period | Quarterly Fees Paid | Fee Amount Under the Pre-Amendment Schedule | Difference Between Fee Paid and Pre-Amendment Fee Schedule |
|---|---|---|---|
| Q1 2018 | $250,000 | $30,000 | $220,000 |
| Q2 2018 | $250,000 | $30,000 | $220,000 |
| Q3 2018 | $157,858.72 | $20,000 | $137,858.72 |
| Q4 2018 | $250,000 | $30,000 | $220,000 |
| Q1 2019 | $185,027.12 | $20,000 | $165,027.12 |
| Q2 2019 | $250,000 | $20,000 | $230,000 |
| Q3 2019 | $0 | $13,000 | $0 |
| Q4 2019 | $0 | $13,000 | $0 |
| **Total** | **$1,342,885.84** | **$176,000.00** | **$1,192,885.84** |

("Winnick Decl.," ECF Doc. # 17 ¶ 19; SUNE Facts ¶ 61 (citing SUNE Main Case, Post

Confirmation Quarterly Operating Reports, ECF Doc. ## 5410, 5487, 5587, 5726, 5885, and

6005).)  Quarter 3 2019 and Quarter 4 2019 quarterly fees of $127,722.96 and $58,014.97,

respectively, are being withheld by SunEdison as they are in dispute.  (SUNE Facts ¶ 62 (citing

ECF Doc. ## 6118, 6178); *id.* ¶¶ 63–64.)  We assume that SunEdison has withheld subsequent

quarterly payments and will continue to do so.

The following table compares the quarterly fees MG Global paid under the 2017

Amendment with the amounts it would have paid under the Pre-Amendment Schedule for

calendar years 2018 and part of 2019[8]:

---

[8]    As of January 1, 2018, only three of the MF Global Debtors' estates remained open under the MFG Plan:
Holdings Ltd., Finco, and Holdings USA.  (*See* MFG Facts ¶ 46.)  On February 11, 2016, the Court entered an order
of final decree closing the chapter 11 cases of MF Global Capital LLC, MF Global FX Clear LLC, and MF Global
Market Services LLC.  (*See* MFG Main Case, ECF Doc. # 2201.)

| Period | Quarterly Fee Paid | Fee Amount Under the Pre-Amendment Schedule | Difference Between Fee Paid and Pre-Amendment Fee Schedule |
|---|---|---|---|
| Q1 2018 | $422,784 | $50,325 | $372,459 |
| Q2 2018 | $25,334 | $13,650 | $11,684 |
| Q3 2018 | $36,447 | $16,900 | $19,547 |
| Q4 2018 | $29,533 | $13,650 | $15,883 |
| Q1 2019 | $16,562 | $12,350 | $4,212 |
| Q2 2019 | $10,725 | $10,725 | $0 |
| **Total** | **$541,385** | **$117,600** | **$423,785** |

(MFG Facts ¶ 64 (citing "Siddiqui Decl.," ECF Doc. # 18, Ex. 15).)

### E.    The Adversary Proceedings

#### 1.    The MF Global Adversary Proceeding

On October 22, 2019, MF Global commenced an adversary proceeding to determine its

liability for quarterly fees payable to the UST Program pursuant to 28 U.S.C. § 1930(a)(6).

("MFG Complaint," ECF Doc. # 1.)  The MFG Complaint names William K. Harrington, in his

official capacity as United States Trustee for Region 2, Clifford J. White III, in his official

capacity as Director of the UST Program, and the UST Program as defendants (collectively, the

"UST").  (*Id.*)  The MFG Complaint seeks a declaration that the quarterly UST fees payable

under the MFG Plan must be calculated under the Pre-Amendment Schedule and requests an

order requiring the UST to refund $423,785 in excess fees paid by the Plan Administrator to the

UST Program from January 1, 2018 to date.  (*Id.* at 2.)  The MFG Complaint asserts that the

increased quarterly fees under the 2017 Amendment do not apply to MF Global, and if the 2017

Amendment does apply to MF Global, it would violate the U.S. Constitution.  (*Id.* at 12.)

On November 21, 2019, MF Global filed a motion for summary judgment and a

statement of undisputed facts.  ("MFG SJ Motion," ECF Doc. # 9; MFG Facts, ECF Doc. # 15.)

The MFG SJ Motion is supported by a memorandum of law and the declarations of Laurie R.

10

Ferber, Wade Preston, and Furqaan Siddiqui. ("MFG MOL," ECF Doc. # 12; "Ferber Decl.,"

ECF Doc. # 16; "Preston Decl.," ECF Doc. # 17; Siddiqui Decl., ECF Doc. # 18.) On November

21, 2019, the UST filed a cross-motion for summary judgment and a statement of undisputed

facts. ("MFG UST SJ Motion," ECF Doc. # 10; "MFG UST Facts," ECF Doc. # 11.) The MFG

UST SJ Motion is supported by a memorandum of law. ("MFG UST MOL," ECF Doc. # 13.)

Additional briefs and replies were filed on December 17, 2019. ("MFG Facts Resp.,"

ECF Doc. # 25; "MFG Opposition," ECF Doc. # 26; "MFG UST Opposition," ECF Doc. # 27;

"MFG UST Facts Resp.," ECF Doc. # 28.) The MFG Opposition is supported by a supplemental

declaration of Furqaan Siddiqui. ("Supp. Siddiqui Decl.," ECF Doc. # 24.) On January 14,

2020, the UST filed a Notice of Supplemental Authority bringing to the Court's attention a

relevant decision issued since the cross-motions and oppositions were filed. ("MFG UST Supp.

Authority," ECF Doc. # 33.) On January 30, 2020, the UST filed the declaration of Andrew D.

Velez-Rivera in support of the MFG UST SJ Motion. ("Velez-Rivera Decl.," ECF Doc. # 35.)

On March 12, 2020, MF Global filed a joinder to SunEdison's summary judgment

briefing submitted in the adversary proceeding commenced by SunEdison. (ECF Doc. # 37.) On

March 16, 2020, the UST filed a joinder to the United States' summary judgment briefing

submitted in the adversary proceeding commenced by SunEdison. (ECF Doc. # 38.) Oral

argument was scheduled to be heard on Friday, March 20 at 10:00 a.m. On March 16, 2020, the

Court decided to cancel the oral argument and take the cross-motions for summary judgment

under submission. (ECF Doc. # 39.)

### 2.    The SunEdison Adversary Proceeding

On December 6, 2019, SunEdison commenced an adversary proceeding to determine its

liability for quarterly fees payable to the UST Program pursuant to 28 U.S.C. § 1930(a)(6).

11

("SUNE Complaint," ECF Doc. # 1.)  The SUNE Complaint names the United States of America

(collectively with the defendants named in the MFG Complaint, the "Defendants" or the "UST")

and seeks (i) a declaration that the quarterly UST fees payable under the SUNE Plan must be

calculated under the Pre-Amendment Fee Schedule and (ii) an order requiring the UST to refund

any excess fees paid to the UST Program from January 1, 2018 to date.  (*Id.* at 2.)  Like the MFG

Complaint, the SUNE Complaint asserts that the increased quarterly fees under the 2017

Amendment do not apply to SunEdison, and if the 2017 Amendment does apply to SunEdison, it

would violate the U.S. Constitution.  (*Id.* at 2–3.)  The UST filed an answer and counterclaim

seeking a judgment for the unpaid fees.

On February 3, 2020, SunEdison filed a motion for summary judgment and a statement of

undisputed facts.  ("SUNE SJ Motion," ECF Doc. # 14; SUNE Facts, ECF Doc. # 16.)  The

SUNE SJ Motion is supported by a memorandum of law and the declarations of Jeffrey Winnick

and David W. Parham.  ("SUNE MOL," ECF Doc. # 15; Winnick Decl., ECF Doc. # 17;

"Parham Decl.," ECF Doc. # 18.)  On February 3, 2020, the UST filed a cross-motion for

summary judgment and a statement of undisputed facts.  ("SUNE UST SJ Motion," ECF Doc. #

10; "SUNE UST Facts," ECF Doc. # 13.)  The SUNE UST SJ Motion is supported by a

memorandum of law and the declaration of Paul Schwartzberg.  ("SUNE UST MOL," ECF Doc.

# 11; "Schwartzberg Decl.," ECF Doc. # 12.)

On March 10, 2020, additional opposition briefs and responses to the statements of facts

were filed.  ("SUNE Facts Resp.," ECF Doc. # 22; "SUNE Opposition," ECF Doc. # 23; "SUNE

UST Facts Resp.," ECF Doc. # 25; "SUNE UST Opposition," ECF Doc. # 24.)  The SUNE

Opposition is supported by a supplemental declaration of David W. Parham.  ("Supp. Parham

Decl.," ECF Doc. # 27.)  No replies were filed.  (*See* ECF Doc. # 3 ¶ 8.)  Oral argument was

scheduled to be heard on Friday, March 20 at 10:00 a.m.  On March 16, 2020, the Court decided

to cancel the oral argument and take the cross-motions for summary judgment under submission.

(ECF Doc. # 29.)

F.     **The UST Program**[9]

Before discussing the legal issues raised by the motions, it is necessary to consider the

creation of the UST Program, the separate system for administering cases in the BA Districts and

the reasons why Congress increased the quarterly fees in the UST Districts but not in the BA

Districts.  The UST Program is a component of the United States Department of Justice.  (MFG

UST Facts ¶ 1.)  Pursuant to 28 U.S.C. § 586, which sets forth the USTs' duties, USTs perform

enforcement, administrative, and regulatory duties in the bankruptcy system and "serve as

bankruptcy watch-dogs to prevent fraud, dishonesty, and overreaching in the bankruptcy arena."

(MFG UST Facts ¶ 2 (quoting H.R. Rep. No. 95-595, at 88 (1977).)

In 1978, Congress enacted 28 U.S.C. § 1930 as part of the law establishing the current

Bankruptcy Code, which was entitled, "[a]n act to establish a uniform Law on the Subject of

Bankruptcies."  Pub. L. No. 95-598, 92 Stat. 2549 (1978).  Among other things, section 1930

established the UST Program, which began as a pilot program in eighteen judicial districts and

was made permanent by Congress in the Bankruptcy Judges, United States Trustees, and Family

Farmer Bankruptcy Act of 1986 (the "1986 Act").  (MFG UST MOL ¶ 13 (citing Pub. L. No. 99-

554, §§ 111–115, 100 Stat. 3088 (1986); Pub. L. No. 95-598, §§ 224(a), 408, 92 Stat. 2549

(1978)); SUNE MOL at 12).)

---

[9]     The following facts are provided in the parties' statements of material facts and respective responses.  Any
dispute as to a material fact is indicated in a footnote.

The 1986 Act established the UST Fund as a special fund within the United States Treasury.  28 U.S.C. § 589a(a).  Collections of fees by the UST, including the quarterly fees, were deposited into the UST Fund.  (SUNE MOL at 12–13.)  While Congress appropriates funds to pay the expenses of the UST system, the amounts in the UST Fund serve as offsets to the appropriations.  28 U.S.C. § 589a(b).  Thus, if the collections equal or exceed the expenses, the UST Program is self-funding.

As noted, the UST Program currently operates in eighty-eight of the ninety-four federal judicial districts, including the Southern District of New York.  The BAs administer bankruptcy cases in Alabama and North Carolina ("BA Program").  The BA Program is housed in the Judicial Branch and overseen by the Administrative Office of the United States Courts.  (MFG UST Facts ¶ 3; MFG Facts ¶ 23.)  The Administrative Office of the United States Courts is supervised by the Judicial Conference of the United States.  (MFG Facts ¶ 24.)  The Judicial Conference is chaired by the Chief Justice of the United States and includes as members the Chief Judge of each judicial circuit, the Chief Judge of the Court of International Trade, and a District Judge from each judicial circuit.  (*Id.* ¶ 25.)

Prior to 2000, payment of chapter 11 quarterly fees was required in the UST Districts but not in the six BA Districts.  (MFG UST Facts ¶ 9.)  In 1994, a divided panel of the Ninth Circuit concluded that the absence of quarterly fees in the BA Districts rendered 28 U.S.C. § 1930 unconstitutionally non-uniform.  *St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525 (9th Cir. 1994), *modified*, 46 F.3d 969 (9th Cir. 1995).  Upon the recommendation of the Judicial Conference, Congress amended section 1930(a) to provide that "[i]n districts that are not part of a United States trustee region . . . the Judicial Conference of the United States may require the debtor in a case under chapter 11 . . . to pay fees equal to those imposed by paragraph (6) of this

14

subsection." (MFG UST Facts ¶ 9 (quoting 28 U.S.C. § 1930(a)(7)) (alteration in original).)  On

April 1, 2002, the Judicial Conference exercised its authority under 28 U.S.C. § 1930(a)(7) and

began requiring chapter 11 debtors to pay quarterly fees in BA Districts "in the amounts

specified in 28 U.S.C. § 1930, as those amounts may be amended from time to time."  (*Id.* ¶¶ 9–

10 (quoting Supp. Siddiqui Decl., Ex. 36 (ECF Doc. # 24-10), Report of the Proceedings of the

Judicial Conference of the United States, Sept./Oct. 2001, at 18); MFG Facts Resp. at 4–5.)

Consequently, and until the quarter beginning on January 1, 2018 when the increased fees went

into effect in the UST Districts, chapter 11 debtors in all ninety-four districts paid quarterly fees

based on the same disbursement formula.

### G.    History and Implementation of the 2017 Amendment

For several decades, Congress's annual appropriations to the UST Program were entirely

offset by fees deposited in the UST Fund so that the costs of the UST Program were ultimately

borne by bankruptcy users, not by taxpayers.  (MFG UST Facts ¶¶ 4–6.)  In the mid-2010s,

however, deposits into the UST Fund began to substantially decrease "due to overall declining

bankruptcy filings nationwide."  (*Id.* ¶ 11 (quoting H.R. Rep. No. 115-130, at 7 (2017)).)  By

fiscal year 2017, the balance in the UST Fund had fallen to the point that the UST Program's

costs were no longer fully met by fees paid by bankruptcy users.  (*Id.* ¶ 12.)  Concerned about

this shift in financial burden to taxpayers, Congress decided to bolster the UST Fund by

temporarily increasing quarterly fees in large chapter 11 cases.  (*Id.* ¶ 13.)

Congress responded by proposing to raise the quarterly fees in large chapter 11 cases to

create a surplus in the UST Fund.[10]  The May 17, 2017 House Judiciary Committee Report  to

---

[10]    The most significant source of revenue for the UST Fund is quarterly fees paid by debtors in chapter 11 cases.  (MFG UST Facts ¶ 7.)  MFG states that this is "[n]ot disputed for purposes of summary judgment, but not supported by the evidence cited by Defendants."  (MFG Facts Resp. at 4.)

accompany H.R. 2266 ("House Report," Supp. Siddiqui Decl., Ex. 30 (ECF Doc. # 24-4)), noted

that historically, the fees collected by the UST Program exceeded the funds appropriated to run

the program. (House Report at 8.) The collected funds, which were paid into the U.S. Treasury,

were sufficient to offset the appropriations (*id.*), permitting the UST Program to generate a

surplus and operate without burdening the U.S. taxpayers. However, in recent years, the

appropriations exceeded the collections due to dwindling filings and the surplus was being

depleted. (*Id.*) Congress noted, in this regard, that 61% of the UST Program's revenue came

from quarterly fees in chapter 11 cases. (*Id.* at 8 n.26.) To meet this problem, the 2017 Act

provided for an increase in quarterly fees charged to the largest chapter 11 debtors. (*Id.* at 9.) In

addition, the Act provided for the creation or extension of eighteen temporary judgeships and a

small portion of the fee increase was designed to pay for the increased expenses associated with

those judgeships.[11] The fee increase was directly tied to the balance in the UST Program Fund

and would "cover the costs of this bill and the separately needed funds for the operations of the

U.S. Trustee Program." (*Id.* at 9; *accord id.* at 10.)

The next day, the Congressional Budget Office ("CBO") "scored" H.R. 2266 under pay-

as-you-go, 2 U.S.C. §§ 931, *et. seq* ("PAYGO"), to determine its budgetary effects.[12] (Supp.

Siddiqui Decl., Ex. 31 (ECF Doc. # 24-5).) It projected revenues of $21 million under section

1930 to fund the temporary judgeships during the five-year lifetime of the increased fees (2018–

2022) with the largest amount of revenue ($5 million) occurring in fiscal year 2018 (October 1,

2017 to September 30, 2018), the first fiscal year that the increase was in effect. Importantly, the

---

[11]     Of the eighteen judgeships, four were created in the UST Districts, 2017 Act § 1003, and thirteen were
extended in the UST Districts. *Id.* § 1002. One existing temporary judgeship in the Eastern District of North
Carolina was also extended. *Id.* § 1002(a)(F).

[12]     The purpose of PAYGO "is to reestablish a statutory procedure to enforce a rule of budget neutrality on
new revenue and direct spending legislation." PAYGO § 931.

16

CBO confirmed that its estimates were based on the "increasing [] amount of fees paid to the DOJ by entities *that are already in bankruptcy* and that have disbursements . . . of more than $1 million per quarter.  (*Id.* at 6 (emphasis added).)[13]

The 2017 Act was enacted on October 26, 2017.  As of September 30, 2017, the balance in the UST Fund was well below the $200 million statutory threshold.  As a result, beginning with calendar quarter January 2018, the UST Program calculated quarterly fees pursuant to the 2017 Amendment for all chapter 11 cases, including pending cases, where quarterly disbursements totaled $1 million or more.  (MFG Facts ¶ 42; MFG UST Facts Resp. ¶ 42.)  The annual budgetary obligations of the UST Program were estimated to be $228 million, and the UST Program expected to collect enough quarterly fees from chapter 11 debtors to produce a $199 million balance in the UST Fund as of December 31, 2019.  (SUNE MOL at 15 (citing *Office of Mgmt. & Budget Exec. Office of the President, Budget of the U.S. Gov't, Fiscal Year 2020* (2019), GOVINFO, https://www.govinfo.gov/features/budget-fy2020 (last visited Apr. 23, 2020)).)  Under the Consolidated Appropriations Act of 2020, which became law on December 20, 2019, 28 U.S.C. § 1930(a)(6)(B) was amended "by substituting '$300,000,000' for '$200,000,000.'"  Consolidated Appropriations Act of 2020, Pub. L. No. 116-93, § 219, 133 Stat. 2317, 2415 (2019) ("2019 Amendment").  By the end of 2020, the UST Fund is projected to have an approximate $369 million surplus.  (SUNE MOL at 16.)

---

[13]    The CBO issued a supplemental estimate on October 12, 2017.  It noted that the 2017 Act would increase certain quarterly fees paid in "ongoing" chapter 11 cases "by $3 million in fiscal year 2018 and by $16 million over the 2018-2022 and 2018-2027 periods."  (Parnham Decl., Ex. 11 (ECF Doc. # 18-12) at 3.)

## H.      The BA Districts

Although the Judicial Conference's 2001 resolution "that such fees be imposed in bankruptcy administrator districts in the amounts specified in 28 U.S.C. § 1930, as those amounts may be amended from time to time," (Supp. Siddiqui Decl., Ex. 36 (ECF Doc. # 24-10) at 18), implied that the fees in the BA Districts would increase automatically at the same time, that is not what occurred.  Instead, the six BA Districts did not begin imposing the increased fees until October 2018, when the Judicial Conference directed that the quarterly fee increase be implemented in BA Districts and only in "cases filed on or after" that date.  (MFG UST Facts ¶ 19 (quoting Report of the Proceedings of the Judicial Conference of the United States, Sept. 2018, at 11–12); MFG Facts Resp. at 5, 8; *see* Supp. Siddiqui Decl., Ex. 28 (ECF Doc. # 24-2), 2018 BA District Announcements.)  Thus, the increased fees in the BA Districts commenced nine months after the increase in the UST Districts and only applied to newly filed cases.

## III.      <u>LEGAL STANDARD</u>

The parties submit the instant cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c)(1)(A), which is applicable in this proceeding pursuant to Federal Rule of Bankruptcy 7056.  The standards for summary judgment were explained by the district court in *Thomas v. River Greene Constr. Grp. LLC*, No. 17 CIV. 6954 (PAE), 2018 WL 6528493, at *3–4 (S.D.N.Y. Dec. 11, 2018):

> To prevail on a motion for summary judgment, the movant must "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

> If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145

(2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). Rather, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." FED. R. CIV. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)) (internal quotation marks omitted).

*Id.* (alterations in original). To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." FED. R. CIV. P. 56(c)(1)(A).

## IV. <u>DISCUSSION</u>

The Plaintiffs contend that the 2017 Amendment applies, by its terms, only to cases filed after its effective date. If it is interpreted to apply to their cases, then the 2017 Amendment (1) is impermissibly retroactive and violates the Due Process Clause; (2) violates the Takings Clause; and, in all events, (3) violates the Bankruptcy Clause's requirement that bankruptcy laws be uniform. For the reasons discussed below, we conclude that the 2017 Amendment applies to MF Global and SunEdison's bankruptcy proceedings and does not violate the U.S. Constitution.

### A.    Retroactivity

In determining the retroactive effect of legislation, courts engage in a two-step analysis. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). First, using ordinary tools of statutory construction, courts ask whether Congress "has expressly prescribed the statute's proper reach." *Id.* at 280; *see also Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006); *Centurion v. Sessions*, 860 F.3d 69, 74–75 (2d Cir. 2017). Second, if Congress has not expressly

19

indicated retroactive application, courts must determine whether the new provision has a

disfavored retroactive consequence by "affecting substantive rights, liabilities, or duties on the

basis of conduct arising before its enactment."  *Gonzales*, 548 U.S. at 37 (quoting *Landgraf*, 511

U.S. at 278).  The questions are whether the 2017 Amendment, by its terms, applies to pending

cases, and whether its application to pending cases leads to impermissibly retroactive

consequences.

### 1.      The 2017 Amendment Applies to Pending Cases

Although Congress did not indicate in so many words that the 2017 Amendment applied

to cases pending on the effective date, ordinary tools of statutory construction support that

conclusion.  The 2017 Amendment was enacted following a CBO estimate of the 2017 Act's

budgetary effects under PAYGO.  The CBO estimate expressly stated it was based on the

application of the increased fees to debtors "that are currently in Chapter 11" and concluded that

the bill was budget neutral.  (*See* Supp. Siddiqui Decl., Ex. 31 (ECF Doc. # 24-5), at 2) ("CBO

estimates that enacting H.R. 2266 would not increase net direct spending or on-budget deficits in

any of the four consecutive 10-year periods beginning in 2028.").)  Such reports are important

sources of legislative intent.  *See* 2A NORMAN SINGER & SHAMBIE SINGER, SUTHERLAND

STATUTORY CONSTRUCTION § 48.7 (7th ed.) ("The U.S. Congress sometimes authorizes special

investigating committees as well, and their reports also often have interpretive value.  Congress

usually relies on the investigative work of its standing committees, executive departments, and

administrative agencies.")  Furthermore, the CBO estimated that the revenues from the fee

collections would be the highest ($5 million) in fiscal year 2018 (October 1, 2017 to September

30, 2018) during which the increased fees would be in effect for only three quarters.  (*See* Supp.

Siddiqui Decl., Ex. 31 (ECF Doc. # 24-5), at 3.)  The collections could not meet the CBO estimate and achieve budget neutrality unless the increased fees applied in pending cases.

One would expect that in adopting the 2017 Amendment primarily aimed at generating a surplus for the UST Program and to a lesser extent funding eighteen temporary bankruptcy judgeships, Congress was acting on the CBO estimate which assumed the quarterly fee increase would be collected in pending chapter 11 cases.  If the 2017 Amendment did not apply to pending cases, it would not have generated the funds the CBO estimated had to be generated to meet the funding requirements of the 2017 Act.  Thus, the only permissible inference is that Congress adopted the CBO's funding assumption without which the 2017 Amendment would not have worked.

In addition, we reject MF Global's negative inference that contemporaneous changes to the chapter 12 discharge, which applied to some pending cases coupled with the silence regarding the applicability of the 2017 Amendment to pending cases must mean that Congress did not intend the 2017 Amendment to apply in pending cases.  A Court may not draw a "negative inference" where two parts of a statute deal with different subject matter and one part of the statute expressly applies to pending cases and another part—which is silent on that score—does not.  *Martin v. Hadix*, 527 U.S. 347, 356 (1999).  The 2017 Act section 1005(a) enlarged the scope of the chapter 12 discharge by adding section 1232 to the Bankruptcy Code.  The purpose of the amendment was to undo the decision in *Hall v. United States*, 566 U.S. 506 (2012).  8 COLLIER ON BANKRUPTCY ¶ 1232.01 (16th ed. 2020).  There, the Supreme Court held that federal income tax liability arising from the post-petition sale of a farm was not dischargeable.  *Hall*, 566 U.S. at 523–24.  Section 1232 treats the tax as a general unsecured

claim that is discharged to the extent set forth in 11 U.S.C. § 1228.  8 COLLIER ON BANKRUPTCY ¶ 1232.01.

Congress expressly provided that the chapter 12 amendment would apply only to (a) pending cases, (b) without a confirmed plan, (c) where a section 1228 discharge has not been entered.  2017 Act § 1005(c)(1).  The distinction between pending cases with a confirmed plan and pending cases without a confirmed plan makes sense.  The chapter 12 amendment was not intended to modify retroactively the effect of the discharge granted under a confirmed chapter 12 plan by expanding the scope of that discharge based on a statute that was not in effect when the plan was confirmed.  In contrast, the 2017 Amendment to 28 U.S.C. § 1930(a)(6) concerns the collection of fees in large, open chapter 11 cases based on future disbursements whether or not a plan has been confirmed.  Moreover, unlike the discharge in chapter 12, the 2017 Amendment does not affect vested rights under a confirmed plan, and hence, there was no reason to carve out pending cases where a plan had been confirmed.

Next, MF Global points to how Congress dealt with the clarification of a 1996 fee increase.  (*See* MFG MOL at 20–22).  When originally enacted, section 1930(a)(6) imposed quarterly fees until a plan was confirmed.  In January 1996, Congress amended section 1930(a)(6) to impose the quarterly fees "until the case is converted or dismissed."  The Balanced Budget Downpayment Act, Act I, Pub. L. No. 104-99, § 211, 110 Stat. 26, 37–38 (1996).  Courts reached differing conclusions about whether the 1996 amendment applied to pending cases.  In September 1996, Congress clarified that the 1996 amendment applied to cases pending on the date when the amendment was first enacted.  Act of Sept. 30, 1996, Pub. L. No. 104-208, 110 Stat. 3009-19 (1996).  MF Global argues that Congress's failure to expressly provide that the

2017 Amendment applied to pending cases "is powerful evidence that retroactive application was not intended."  (MFG MOL at 21.)

How Congress dealt with the 1996 Amendment is irrelevant to the interpretation of the 2017 Amendment.  *In re Mosaic Mgmt. Grp., Inc.*, No. 16-20833-EPK, 2020 WL 1808605, at *5 (Bankr. S.D. Fla. Apr. 9, 2020) (describing as "faulty logic" reliance on the 1996 clarifying amendment that fee applied to pending cases).  It is equally plausible that Congress viewed the applicability of the 2017 Amendment as a given.  The CBO estimate required under PAYGO assumed that the fee increase applied to pending cases and it was unreasonable to argue that Congress ignored the estimate and excluded pending cases.

Moreover, the Plaintiffs' reliance on the decision of the Judicial Conference to apply the increases prospectively does not bear on the interpretation of the 2017 Amendment.  Congress's intent rather than the actions by the Judicial Conference must determine the meaning of the 2017 Amendment.  Besides, nothing suggests that when the Judicial Conference resolved to apply the fee increase only to newly filed cases it thought about what Congress had intended.  In fact, the Judicial Conference was not interpreting the statute at issue, which applies only to UST Districts, but instead, was determining how to apply fee increases under section 1930(a)(7) in the BA Districts.

Two bankruptcy courts—*In re Buffets, LLC*, 597 B.R. 588 (Bankr. W.D. Tex. 2019), *appeal filed sub nom. Hobbs v. Buffets, LLC*, No. 19-50765 (5th Cir. Aug. 16, 2019) and *In re Life Partners Holdings, Inc.*, 606 B.R. 277 (Bankr. N.D. Tex. 2019), *appeal filed sub nom. Neary v. Quilling*, No. 19-90041 (5th Cir. Dec. 13, 2019)—came to the opposite conclusion.  *Buffets* stated that Congress did not express the reach of the 2017 Amendment, the legislative history provided little guidance and "[a]bsent clear congressional intent, the court is not to read 'a statute

substantially increasing the monetary liability of a private party to apply to conduct occurring before the statute's enactment.'"  597 B.R. at 597 (quoting *Landgraf*, 511 U.S. at 284).  *Life Partners* adopted *Buffets*'s reasoning.  606 B.R. at 283.  In addition, it rejected the UST's argument that application of the increased fees in "ongoing" cases mentioned in the CBO's October 2017 necessarily meant pending cases, especially given how Congress dealt with the scope of the 1996 increases with a clarifying amendment.  *Id.* at 284–85.  But nothing suggests that Congress understood the CBO to be deviating from its earlier estimate based on the application of the fee increase to cases already filed.  If the collections started from zero cases in second quarter of fiscal year 2018 and had to wait for newly filed cases to collect the increased fees, the estimated revenue should have been substantially less than the entire fiscal year 2019 revenue.  But it was the same.[14]

Accordingly, we conclude that the 2017 Amendment, by its terms, applies to disbursements made in pending cases on and after January 1, 2018.

## 2.    The Application of the 2017 Amendment to Pending Cases is not Retroactive

In any event, we conclude that the application of the 2017 Amendment to future disbursements in pending cases is not retroactive.  A law has retroactive effect if it "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."  *Landgraf*, 511 U.S. at 280.  The 2017 Amendment imposes increased fees on disbursements made on and after January 1,

---

[14]      *Life Partners* also wondered why the CBO decreased its revenue estimate from $5 million in the May to $3 million in October.  *Life Partners*, 606 B.R. at 284 n.24.  At the time of the May CBO estimate, H.R. 2266, § 4(b)(2) provided that 2.5% of the fees collected under the bill would be deposited in the U.S. Treasury and the May estimate operated under that assumption.  (Supp. Siddiqui Decl., Ex. 31 (ECF Doc. # 24-5), at 5.)  By the time of the October CBO estimate, the bill reduced the deposit to 2%.  The reduced percentage may explain the reduced projection in revenues for fiscal year 2018 and thereafter.

2018 and does not change any substantive rights under the Plaintiffs' plans.  The Plaintiffs' plans expressly required them to pay the quarterly fees post-confirmation.  While the Plaintiffs and their creditors may have harbored different expectations about what the future held, UST fees included, the increase did not affect any rights under their plans.

The 2017 Amendment, in this regard, is "more akin to 'taxes arising post confirmation, or any similar post-confirmation expenses'" which are not retroactive.  *See In re Exide Techs.*, 611 B.R. 21, 29 (Bankr. D. Del. 2020), *appeal filed* No. 20-8023 (3d Cir. Apr. 2020) (quoting *In re Circuit City Stores, Inc.*, 606 B.R. 260, 268 (Bankr. E.D. Va. 2019), *appeal filed sub nom. Fitzgerald v. Siegel*, Nos. 19-2240, 19-2255 (4th Cir. Nov. 2019)).  For this reason, the majority of the bankruptcy courts to consider the question have held that the increase in fees imposed under the 2017 Amendment based on future disbursements in pending cases does not operate retroactively.  *Mosaic*, 2020 WL 1808605, at *5 ("The change to the UST fee payable in larger chapter 11 cases, effected by the Amendment, is entirely prospective as it applies only to disbursements made after the effective date of the Amendment.  The fact that the fee increase impacts pending chapter 11 cases does not make the Amendment retroactive in the constitutional sense.");  *In re Clayton Gen., Inc.*, No. 15-64266, 2020 Bankr. LEXIS 842, at *13–14 (Bankr. N.D. Ga. Mar. 30, 2020) ("The Court concludes the statute by its terms applies to all cases, including this one, in which disbursements were made beginning January 1, 2018."); *Exide*, 611 B.R. 21 at 30 ("[T]he Court concludes that the 2017 Amendment is not a retroactive statute because it applies only to post-enactment date disbursements of debtors in cases pending on or after the enactment date."); *Circuit City*, 606 B.R. at 268 ("A mere increase in the quarterly U.S. Trustee fee is not substantively retroactive.  It is more akin to taxes arising post confirmation, or any similar post-confirmation expenses.") (internal quotation marks and citation omitted); *cf.*

*Ziegler v. Comm'r of Internal Revenue*, 282 F. App'x 869, 869–70 (2d Cir. 2008) (unpublished) (rejecting Due Process challenges based on retroactive application of tax legislation reasoning that "[b]y its express terms," the statute's limitations "applie[d] to losses incurred in the years following its enactment"); *United States Tr. v. Gryphon at Stone Mansion, Inc.*, 166 F.3d 552, 557 (3d Cir. 1999) (characterizing post-confirmation fees as administrative claims, similar to post-confirmation taxes); *In re CF & I Fabricators of Utah, Inc.*, 150 F.3d at 1238 (noting that fees only applied prospectively to disbursements made after the effective date and, thus, were no different from post-confirmation taxes and other expenses which might change over time).

As noted above, *Buffets* and *Life Partners* read the 2017 Amendment to apply only to newly filed cases. In reaching its conclusion, the *Buffets* court focused on the time the chapter 11 case was filed and the date of confirmation, both of which preceded the adoption of the 2017 Amendment and concluded that applying the 2017 Amendment to their cases would be retroactive. The *Buffets* court stated that the 2017 Amendment imposed new duties and liabilities on the debtor "with respect to transactions already completed[,] . . . the priority claimants would be at risk of non-payment and the plan's feasibility would be compromised." 597 B.R. at 596. The debtor had to pay 833% more in UST fees than under the Pre-Amendment Schedule and the 2017 Amendment "would allow the UST to divert funds from the Reorganized Debtors' already lean budget to their extreme detriment. If the amendment applied to this case, the priority claimants would be at risk of non-payment and the plan's feasibility would be compromised." *Id.*

Unsettled expectations do not make the application of the 2017 Amendment to pending cases retroactive. As *Landgraf* explained:

> Even uncontroversially prospective statutes may unsettle expectations and impose burdens on past conduct: a new property tax or zoning regulation may upset

the reasonable expectations that prompted those affected to acquire property; a new law banning gambling harms the person who had begun to construct a casino before the law's enactment or spent his life learning to count cards. *See* [L. Fuller, The Morality of Law 51, 60 (1964)] ("If every time a man relied on existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever"). Moreover, a statute "is not made retroactive merely because it draws upon antecedent facts for its operation."

511 U.S. at 269 n.24 (citations omitted); *accord Mosaic*, 2020 WL 1808605, at *4. Although the fee increase may have affected the expectations of the stakeholders in their cases, the Plaintiffs have failed to explain how the 2017 Amendment affected any rights granted under their confirmed plans or attached new legal consequences to any acts completed before the 2017 Amendment was enacted.

For this reason, the Plaintiffs' reliance on *Vartelas v. Holder*, 566 U.S. 257 (2012), (*see* MFG Opposition at 14–15; SUNE Opposition at 10–11), is misplaced. There, the Supreme Court examined the constitutionality of imposing the effects of the Illegal Immigration Reform and Immigrant Responsibility Act, 110 Stat. 3009-546 ("IIRIRA"), on people who committed crimes before the Act was passed. IIRIRA required lawful and permanent residents who committed certain crimes to reapply for admission upon reentering the country from a brief trip. *Vartelas*, 566 U.S. at 262–63. Vartelas had pleaded guilty to two such crimes when the law did not require reapplication and challenged his exclusion on the grounds that the law should not be applied retroactively to him. *Id.* at 263. Although the Government argued that the law did not operate retroactively because it applied solely to future reentries, the Court opined that the "reason for the 'new disability' imposed on him" was his pre-enactment guilty plea. *Id.* at 269–70. MF Global argues that here, as in *Vartelas*, the 2017 Amendment "attaches new legal consequences," *i.e.*, dramatically increased fees, "to events completed before its enactment," *i.e.*, MF Global's filing of a chapter 11 petition and confirmation of its chapter 11 Plan. (MFG MOL at 23–24.)

27

*Vartelas* is distinguishable because the "new disability" therein—the travel restriction—was based entirely on the conviction that pre-dated the statutory amendment. *Vartelas*, 566 U.S. at. at 269. If Vartelas did nothing else, he would still be disabled as a result of his prior conduct. In contrast, the 2017 Amendment does not attach new legal consequences to a prior act. The increased fees are triggered by increased future disbursements. If the Plaintiffs make no disbursements going forward (or disburse less than $1 million in the quarter), they will not pay increased fees.

Accordingly, we conclude that the application of the 2017 Amendment to disbursements made in cases pending at the time of its enactment is not retroactive.

### B.    Due Process

Even if the 2017 Amendment is retroactive as applied to the Plaintiffs, it does not violate the Due Process Clause. Retroactive civil legislation is subject to the same "modest" constitutional constraints applicable to other due process challenges. *Landgraf*, 511 U.S. at 272. The Due Process Clause is satisfied "simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730 (1984); *accord United States v. Carlton*, 512 U.S. 26, 30–31 (1994); *United States v. Sperry Corp.*, 493 U.S. 52, 64–65 (1989). "[T]he burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Pension Benefit*, 467 U.S. at 729.

The Plaintiffs have failed to meet their burden. Congress enacted the 2017 Amendment with the "legitimate legislative purpose" primarily to ensure that the UST Program remains funded by bankruptcy users rather than by taxpayers at large, and secondarily, to fund eighteen temporary judgeships. *See Mosaic*, 2020 WL 1808605, at *5 ("[E]ven if the Amendment is

28

considered retroactive, it does not violate due process as it serves the legitimate legislative purpose of maintaining the self-funding nature of the UST system and that purpose is achieved by the rational means of increasing fees in the largest chapter 11 cases"); *Exide*, 611 B.R. at 31 ("[E]ven if the 2017 Amendment were retroactive, the Court concludes that application of it to Exide does not violate the Due Process Clause because: 1) Congress had a legitimate legislative purpose of preventing revenue loss and preserving the UST Program's self-funded character, and 2) imposing the fees on larger pending confirmed chapter 11 cases is rationally related to this purpose."); *cf. United States v. Kras*, 409 U.S. 434, 448 (1973) (concluding that bankruptcy filing fee had a rational basis because Congress "sought to make the system self-sustaining and paid for by those who use it rather than by tax revenues drawn from the public at large").

Again, *Buffets* and *Life Partners* reached the opposite conclusion. *Buffets* concluded that 2017 Amendment did not provide the debtors with sufficient notice of the increased fees prior to the filing of the chapter 11 and the plan. *See Buffets*, 597 B.R. at 596–97 (quoting *Landgraf*, 511 U.S. at 266). *Life Partners* adopted *Buffets'* reasoning but speculated it might have upheld the increase if the increase was more modest because debtors have no constitutional right to insist that their quarterly fees remain static. But Congress "crossed the line" by imposing an 833% increase after the plan had been negotiated and confirmed and three successors were charged with making the distributions to creditors. *Life Partners*, 606 B.R. at 288–89.

MF Global makes the same argument: the MFG Plan was confirmed in 2013 at a time when the quarterly fees were capped at a maximum of $30,000 per quarter and the maximum fee would not be due unless a debtor's disbursements for that quarter exceeded $30 million. Moreover, it was clear at the time of confirmation that only certain of the MF Global Debtors' estates would ever be expected to owe fees that would reach this cap, and then almost

29

exclusively during quarters when such a Debtor made particularly large disbursements.  In

addition, when negotiating the Plan, the disbursements were not a material factor, but now they

are 833% more than their original amount five years earlier.  (MFG MOL at 36.)

Neither Plaintiff nor any of its stakeholders could reasonably expect that the quarterly

fees would not increase.  Increased fees are like increased taxes.  The taxpayer hopes they do not

go up but, notwithstanding that hope, they sometimes do.  *See Gryphon*, 166 F.3d at 557 n.7

(application of the fee provision post confirmation under the 1996 amendment did not violate the

Takings Clause "because, due to the vagaries of the bankruptcy process, there can be no

reasonable expectation that the amount of the final distribution will remain fixed throughout the

process"); *United States Tr. v. Prines (In re Prines)*, 867 F.2d 478, 485 (8th Cir. 1989)

(application of quarterly fee provisions to pending cases in the UST pilot program "does not

amount to an unconstitutional taking" because debtors had no more than a unilateral expectation

that Congress would not enact new fees applicable to their cases); *cf. Carlton*, 512 U.S. at 33

("[R]eliance alone is insufficient to establish a constitutional violation.  Tax legislation is not a

promise, and a taxpayer has no vested right in the Internal Revenue Code.").

And the increased fees certainly came as no surprise to SunEdison and its stakeholders.

SunEdison filed their chapter 11 cases beginning in April 2016 and confirmed their joint plan in

July 2017.  In 2015, the Department of Justice indicated that a temporary fee increase for

quarterly disbursements exceeding $1 million would be necessary to offset the declining balance

in the UST Fund.  *See* U.S. Dep't of Justice, U.S. Tr. Program, *FY 2016 Performance Budget*

*Congressional Submission* at 18–20, *available at*

https://www.justice.gov/sites/default/files/jmd/pages/attachments/2015/02/01/18._u.s._trustee_pr

ogram_ustp.pdf (last visited Apr. 23, 2020).  A fee increase similar to the one ultimately enacted

was proposed in the Department's budget submission for the fiscal year 2017. *See* U.S. Dep't of Justice, U.S. Tr. Program, *FY 2017 Performance Budget Congressional Submission* at 9–10, *available at* https://www.justice.gov/jmd/file/821021/download (last visited Apr. 23, 2020). In addition, SunEdison confirmed its plan two months *after* the House Judiciary Committee had rendered its report and the CBO its score, both of which dealt with the impending fee increase, and one month after Clifford J. White III, Director of the Executive Office of United States Trustees, testified before Congress about the need for the fee increase. (Siddiqui Decl., Ex. 5 (ECF Doc. # 18-5), at 13.) Thus, SunEdison and its creditors could not have had any *reasonable* expectation that Congress would not increase the UST fees during the pendency of its bankruptcy and, importantly, the negotiation of the SUNE Plan. (SUNE UST Opposition ¶ 28.)

Nor were Plaintiffs denied adequate notice of the fee increase. The Due Process Clause does not require Congress to give personal notice to affected parties before enacting a change in fees or taxes, even when (unlike here) those changes are tied to past conduct. *See, e.g.*, *Carlton*, 512 U.S. at 34–35 (upholding the "retroactive application" of a statutory amendment because it was "rationally related to a legitimate legislative purpose," notwithstanding plaintiff's arguments about "lack of notice" and detrimental reliance on prior tax law); *Welch v. Henry*, 305 U.S. 134 (1938) (upholding retroactive imposition of tax despite the absence of advance notice of the legislation).

Accordingly, we conclude that even if the application of the 2017 Amendment to disbursements by the Plaintiffs beginning with the first quarter of calendar 2018 was retroactive, its application did not deny the Plaintiffs due process of law.

C.    The Takings Clause

The Fifth Amendment's Takings Clause provides that: "[N]or shall private property be taken for public use, without just compensation."[15]  U.S. CONST. amend. V.  The Takings Clause, which is closely tied to the presumption against retroactivity, *Landgraf*, 511 U.S. at 265–66, imposes two conditions on the government's authority to confiscate private property: "the taking must be for a 'public use' and 'just compensation' must be paid to the owner."  *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 231–32 (2003) (quoting U.S. CONST. amend. V).  "The aim of the Clause is to prevent the government 'from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'"  *E. Enters. v. Apfel*, 524 U.S. 498, 522 (1998) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)).  Takings claims fall into two categories: *per se* takings and regulatory takings.  A *per se* taking results from a physical invasion by the government of property.  *See id.*  "A regulatory taking[] involves government regulation [that] proves to be so onerous that its effect is tantamount to a direct appropriation or ouster."  *Reichert v. Keefe Commissary Network LLC*, 331 F.R.D. 541, 554 (W.D. Wash. 2019) (alteration in original) (citation and internal quotation marks omitted).  The person alleging government action as an unconstitutional taking bears a substantial burden.  *E. Enters.*, 524 U.S. at 523.

MF Global argues that the increased quarterly fees violate the Takings Clause because (1) they constitute the imposition of unanticipated retroactive liability that is substantially disproportionate to the parties' experience within the case and (2) are unconstitutionally

---

[15]    The Constitution protects rather than creates property interests and the existence of a property interest is "determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'"  *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).

excessive user fees.[16]  The UST counters that the application of the 2017 Amendment to this case does not violate the Takings Clause because (1) the 2017 Amendment implicates no right tied to particular property; (2) MF Global voluntarily participated in the bankruptcy system (which is undisputed) and (3) the increased quarterly fees are not unconstitutionally excessive.  (MFG UST MOL ¶¶ 77–95.)

### 1.    No *Per Se* Taking

The imposition of increased quarterly fees under the 2017 Amendment does not impose a *per se* taking because the amendment requires the Plaintiffs to pay a user fee from fungible funds.  "It is beyond dispute that '[t]axes and user fees . . . are not takings,'" *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 597 (2013) (quoting *Brown v. Legal Found. of Wash.*, 538 U.S. at 243 n.2 (Scalia, J., dissenting)) (alteration in original); *see United States v. King Mountain Tobacco Co., Inc.*, 745 F. App'x 700, 703 (9th Cir. 2018) (unpublished) ("[The Act] simply requires [Appellant] to pay a sum of fungible money based on its market share.  That requirement, without more, is not a taking."), unless the fee is unreasonable, but "a reasonable user fee is not a taking if it is imposed for the reimbursement of the cost of government services."  *Sperry*, 493 U.S. at 63; *accord Boddie v. Chung*, No. 09 CV 04789 (RJD)(LB), 2011 WL 1697965, at *2 (E.D.N.Y. May 4, 2011).  Here, the 2017 Amendment was intended primarily to fund a surplus in the UST Fund to ensure that it was sufficient to offset future U.S.

---

[16]    We conclude, and the parties do not dispute, that chapter 11 quarterly fees are user fees.  *See Gryphon*, 166 F.3d at 554 ("Historically, § 1930(a)(6) set forth a scheme to impose the costs of the [UST] Program on its users."); *Exide*, 611 B.R. at 32 ("User fees are fees assessed by the government that are intended to reimburse the government for its costs in providing a service. . . . UST quarterly fees are user fees associated with the debtors' use of the bankruptcy system.") (citations omitted); *In re Kindred Healthcare, Inc*., Nos. 99–3199 (MFW), 2003 WL 22327933, at *3–5 (Bankr. D. Del. Oct. 9, 2003) ("We conclude that the Debtor's constitutional argument is without merit.  The quarterly fees which the UST seeks are user fees, that is, fees associated with the Debtors' use of the bankruptcy judicial system.").

Treasury appropriations and secondarily, to pay for eighteen temporary judgeships.

Accordingly, it is not a *per se* taking.

MF Global's takings challenge relies on *Eastern Enterprises* to show that the 2017

Amendment imposes unanticipated retroactive liability violative of the Due Process and Takings

Clauses.  (MFG MOL at 31–32.)  We have already rejected the Plaintiffs' assertions that the

2017 Amendment operates retroactively or violates their due process rights.  *Eastern Enterprises*

is nevertheless instructive in analyzing whether the 2017 Amendment implicates an identified

property interest under the Takings Clause.

In *Eastern Enterprises*, a plurality of the Supreme Court held that the Coal Industry

Retiree Health Benefit Act of 1992, which imposed an obligation on employers who were no

longer part of the coal industry to pay employees' health care benefits under a series of collective

bargaining agreements in place during the 1970s, resulted in retroactive liability in violation of

the Due Process Clause.  *E. Enters.*, 524 U.S. at 537–38 (plurality opinion), 547 (Kennedy, J.,

concurring).  Five Justices, however, concluded that an obligation to perform an act, such as

paying health benefits, could not violate the Takings Clause.  *See id.* at 539–47.  Notably, Justice

Kennedy's concurrence rejected the petitioners' Takings Clause challenge because no specific

property right was implicated:

> The Coal Act imposes a staggering financial burden on the petitioner, Eastern
> Enterprises, but it regulates the former mine owner without regard to property.  It
> does not operate upon or alter an identified property interest, and it is not applicable
> to or measured by a property interest.  The Coal Act does not appropriate, transfer,
> or encumber an estate in land (*e.g.*, a lien on a particular piece of property), a
> valuable interest in an intangible (*e.g.*, intellectual property), or even a bank account
> or accrued interest.  The law simply imposes an obligation to perform an act, the
> payment of benefits.  The statute is indifferent as to how the regulated entity elects
> to comply or the property it uses to do so.

*Id.* at 540.  While neither the plurality nor Justice Kennedy's concurrence is binding precedent in

the Second Circuit, *see United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 189 (2d Cir.

34

2003), "all circuits that have addressed the issue have uniformly found that a taking does not

occur when the statute in question imposes a monetary assessment that does not affect a specific

interest in property." *McCarthy v. City of Cleveland*, 626 F.3d 280, 285 (6th Cir. 2010)

(concluding that monetary traffic penalty was not an unconstitutional taking because "a taking

does not occur when the statute in question imposes a monetary assessment that does not affect a

specific interest in property"); *id.* at 286 ("Because the challenged ordinance does not seize or

otherwise impair an identifiable fund of money, Plaintiffs have failed to plead a cause of action

under the Takings Clause.").

The financial obligation imposed on MF Global under the 2017 Amendment does not

affect a specific property interest sufficient to fall within the purview of the Takings Clause.

Rather, like the obligation to pay a traffic penalty in *McCarthy*, the increased fees are triggered

by the happening of a contingency—a quarterly disbursement greater than $1 million during any

period when the UST Fund balance at the beginning of the then-current fiscal year is less than

$200 million (now $300 million).  The 2017 Amendment therefore imposes an increase in

quarterly UST fees upon the happening of certain events, without regard to the property MF

Global uses to pay those fees.  There is no link between the government's demand for an

increase in fees and a specific parcel of property or fund of money that has resulted in a Takings

violation in other circumstances. *See Koontz*, 570 U.S. at 614.

MF Global's reliance on *Koontz* to show that a takings claim could arise where the

government orders the payment of a monetary exaction instead of seizing real property is

misplaced.  In *Koontz*, the petitioner sought a permit to develop 3.7 acres of land on a larger

parcel that he owned.  In order to mitigate the environmental impact, he offered to foreclose any

further development on the remaining eleven acres and deed a conservation easement on a

portion of the land.  The water district charged with the decision gave him two options as conditions to the issuance of the permit.  First, he could develop a smaller area, grant an easement on the remaining acreage and install costly improvements on the site.  Second, he could develop the property as proposed and spend money improving land the district owned several miles away.  *Id.* at 601–02.  After the Florida Supreme Court upheld the district's conditions, the Supreme Court granted *certiorari* to determine whether the district's conditions violated the Takings Clause.

The Supreme Court concluded that the conditions imposed by the district involved consideration of a special application of the "unconstitutional conditions doctrine."  *Id.* at 604.  The latter doctrine vindicates enumerated rights, such as just compensation under the Takings Clause, by preventing the government from coercing people into giving up those rights.  *Id.* at 604, 606.  The doctrine, applicable to land-use permit cases under *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987) and *Dolan v. City of Tigard*, 512 U.S. 374 (1994), allows the government "to condition approval of a permit on the dedication of property to the public so long as there is a 'nexus' and 'rough proportionality' between the property that the government demands and the social costs of approving the applicant's proposal."  *Koontz*, 570 U.S. at 605–06 (citations omitted).  This authorizes the government to insist that the applicant bear the full costs of its proposal without engaging in "out-and-out" extortion.  *Id.* at 606 (internal quotation marks and citations omitted).

After explaining the guiding legal principles, the Supreme Court turned to Florida Supreme Court's conclusion that the Takings Clause claim failed because the petitioner had the option to spend money.  *Id.* at 611–12.  Rejecting the distinction, the Supreme Court observed that "the fulcrum this case turns on is the direct link between the government's demand and a

36

specific parcel of real property," *id.* at 614, and "[t]hus, because the proposed offsite mitigation obligation in this case was tied to a particular parcel of land, this case does not implicate the question whether monetary exactions must be tied to a particular parcel of land in order to constitute a taking." *Id.* at 614 n.2. Here, however, and as discussed above, MF Global has not shown any direct link between the increased quarterly fees in the 2017 Amendment and an identifiable property interest sufficient to demonstrate a *per se* Takings Clause violation.

### 2.    No Regulatory Taking

As suggested earlier, a taking can occur under certain circumstances even when no identifiable or physical property is involved. "In contrast to a physical taking, a regulatory taking occurs where 'government regulation of private property [is] so onerous that its effect is tantamount to a direct appropriation or ouster.'" *Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083, 1088–89 (9th Cir. 2015) (quoting *Lingle v. Chevron U.S.A Inc.*, 544 U.S. 528, 537 (2005)) (alteration in original).[17] To determine whether a regulatory taking has occurred, three factors "have particular significance: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 225 (1986) (internal quotation marks and citation omitted). Here, we have already concluded in our discussion of Due Process that the Plaintiffs and their creditors

---

[17]    In *Lingle*, the Court identified two categories of regulatory action that will be deemed *per se* takings under the Fifth Amendment. "First, where government requires an owner to suffer a permanent physical invasion of her property—however minor—it must provide just compensation. . . . A second categorical rule applies to regulations that completely deprive an owner of '*all* economically beneficial us[e]' of her property.'" *Lingle*, 544 U.S. at 538 (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992) (emphasis in original)) (citation omitted). Neither category applies. While the Plaintiffs contend that the increased quarterly fees are excessive, unreasonable and unforeseen, they do not contend that the collection of those fees constitutes a "permanent physical invasion" of their property or deprives them of "all economically beneficial use" of their property.

knew or should have known that the quarterly fees might increase and any contrary expectations were unreasonable. Thus, we consider economic impact and begin with *Sperry*.[18]

*Sperry* involved the fee imposed by Congress on awards made by the Iran-United States Claims Tribunal ("Tribunal") set up to hear claims brought by Americans against the Government of Iran following the 1979 revolution. *Sperry*, 493 U.S. at 55. Sperry filed a claim against the Iranian Government with the Tribunal, the parties settled for $2.8 million and the Tribunal approved the award embodied in the settlement at the parties' request. *Id.* at 56. Awards were paid from a Security Account maintained by the Federal Reserve Bank of New York which was authorized by statute to deduct 1.5% of an award from the first $5 million and 1% of any amount in excess of $5 million. *Id.* at 58. The fee was designed to reimburse the U.S. Government for the expenses incurred in connection with arbitrations before the Tribunal and the maintenance of the Security Account. *Id.*

---

[18]    The parties' alternative formulations of the test to measure reasonableness or excessiveness under the Takings Clause are not persuasive. For example, they argue that the 2017 Amendment imposes unconstitutionally excessive user fees under the test articulated by the Supreme Court in *Nw. Airlines, Inc. v. County of Kent*, 510 U.S. 355, 369 (1994). (MFG MOL at 40–41.) *Northwest* involved a challenge by several airlines to certain user fees charged by airports under the Anti–Head Tax Act (AHTA). The test according to the Supreme Court, which MF Global quotes only in part, is whether the user fee "(1) is based on some fair approximation of use of the facilities, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce." *Nw. Airlines*, 510 U.S. at 369. We cannot see how the test under the AHTA or consideration of discrimination under the Commerce Clause bear on the Takings Clause analysis in these cases. The Plaintiffs' reliance on *Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Authority*, 567 F.3d 79, 86 (2d Cir. 2009) and *United States v. United States Shoe Corp.*, 523 U.S. 360, 361 (1998) to show that the UST fees exceed the costs of the benefits conferred is also inapposite. *Bridgeport* involved the constitutionality of a ferry passenger user fee under the Commerce Clause and Tonnage Clause, and *United States Shoe Corp.* concerned whether a charge was an impermissible tax under the Constitution's Export Clause. In *United States Shoe Corp.*, the Supreme Court made clear that the Export Clause imposes constraints that do not govern in other constitutional analyses. *United States Shoe Corp.*, 523 U.S. at 368–69.

Finally, SunEdison cites the "value to the recipient" test applied in *National Cable Television Ass'n v. United States*, 415 U.S. 336 (1974). (SUNE MOL at 37.) *National Cable* involved a fee assessed by the FCC against cable television operators. The enabling legislation authorized a federal agency to fix a fair and equitable fee "taking into consideration direct and indirect cost to the Government, *value to the recipient*, public policy or interest served, and other pertinent facts . . . ." *Nat'l Cable*, 415 U.S. at 337 (quoting Independent Offices Appropriation Act of 1952, Tit. 5, 65 Stat. 290, 31 U.S.C. § 483a) (emphasis added). The Court concluded that it could not decide whether the FCC had used the correct standard and remanded the matter to the FCC. *Id.* at 343. The case did not even address the Taking Clause.

The Federal Reserve Bank deducted the 1.5% fee and paid the balance of the award to Sperry.  Sperry challenged the deduction, *inter alia*, as a violation of the Takings Clause.  It argued that the deduction could not be upheld as a user fee "because there has been no showing that the amount of the deduction approximates the cost of the Tribunal to the United States or bears any relationship to Sperry's use of the Tribunal or the value of the Tribunal's services to Sperry."  *Id.* at 60.

The Supreme Court found Sperry's submissions "[un]persuasive."  *Id.*  It began with the following observation:

> This Court has never held that the amount of a user fee must be precisely calibrated to the use that a party makes of Government services.  Nor does the Government need to record invoices and billable hours to justify the cost of its services.  All that we have required is that the user fee be a "fair approximation of the cost of benefits supplied."

*Id.* (quoting *Mass. v. United States*, 435 U.S. 444, 463 n.19 (1978) (plurality opinion)).  The Court was "convinced" that the 1.5% deductions were "not so clearly excessive as to belie their purported character as user fees."  *Id*. at 62.  Furthermore, "a reasonable user fee is not a taking if it is imposed for the reimbursement of the cost of government services.  'A governmental body has an obvious interest in making those who specifically benefit from its services pay the cost . . . .'"  *Id.* at 63 (quoting *Mass.*, 435 U.S. at 462 (plurality opinion)).  In addition, Sperry benefited from the Tribunal even if it settled the case and did not actually use the Tribunal's services because those services were available for its use.  *Id.*  "The Tribunal made available to claimants such as Sperry sufficient benefits to justify the imposition of a reasonable user fee."  *Id.* at 64.

The fees imposed by the 2017 Amendment are reasonable under these criteria.  Initially, reasonableness, or its opposite, excessiveness, are not measured by comparing the old fee to the new fee as the Plaintiffs attempt to show with their statistical comparisons.  If that were the test, a fee imposed for the first time would always be excessive because it would be infinitely greater

than no fee prior to the imposition.  Instead, we, as did *Sperry*, consider the size of the fee as measured by a different denominator, the basis on which it is fixed.  Here, the denominator is the quarterly disbursements, not the fee under the Pre-Amendment Schedule.  The fee is the lesser of 1% or $250,000 and is lower than the percentage user fee approved by the *Sperry* Court.  *Accord Lifetime Cmtys., Inc. v. Admin. Office of the United States Courts* (*In re Fid. Mortg. Inv'rs.*), 16 B.R. 477, 479 (S.D.N.Y. 1981) (assessment payable to the Referees' Salary and Expense Fund under the former bankruptcy act of 1.5 percent of the assets distributed to unsecured creditors is not per se inequitable), *aff'd* 690 F.2d 35 (2d Cir. 1982).

Furthermore, the parties do not dispute that the 2017 Amendment is consistent with the goals set by Congress to create a surplus for the UST Fund and pay the expenses of eighteen temporary judgeships.  Given Congress's undisputed purpose "that the deductions are intended to reimburse costs incurred by the United States, the burden must lie with [the Plaintiffs] to demonstrate that the reality of [the 2017 Amendment] belies its express language before we conclude that the deductions are actually takings."  *Sperry*, 493 U.S. at 394.  The Plaintiffs have failed to meet this burden.

Moreover, the validity of the 2017 Amendment under the Takings Clause does not depend on a "precise calibration" of the actual benefits that the Plaintiffs received against the expenses they are paying, assuming that that could ever be quantified.  The point, as *Sperry* explained, is that the services are available.  In addition, the UST Program continues to perform its role in these cases.  It has, among its many duties, the duty of "monitoring the progress of cases under title 11 and taking such actions as the United States trustee deems to be appropriate to prevent undue delay in such progress."  28 U.S.C. § 586(a)(3)(G).  Further, the UST is charged with the duty to report violations to the United States Attorney and assist the United

40

States Attorney in prosecutions. *Id.* § 586(a)(3)(F). These duties continue until the case is dismissed or closed. With one inapplicable exception, the UST may raise, appear, and be heard on any issue in the case. 11 U.S.C. § 307; *see id.* § 1109(b). The UST "is the watchdog that guards the public interest," *Clippard v. LWD Inc. (In re LWD, Inc.)*, 342 B.R. 514, 518 (Bankr. W.D. Ky. 2006), and "when he seeks to protect the rules and procedures of bankruptcy, over which he is the congressionally ordained watchdog—he has a statutory interest in making sure that bankruptcy law isn't abused." *In re S. Beach Secs., Inc.*, 606 F.3d 366, 371 (7th Cir. 2010). The UST has standing post-confirmation to seek revocation of the confirmation order where it is procured by fraud, 11 U.S.C. § 1144, and the conversion or dismissal of the case if the confirmation order is revoked for fraud, *id.* § 1112(b)(4)(L), the plan proponent is unable to substantially consummate the plan, *id.* § 1112(b)(4)(M), the debtor has materially defaulted with respect to the plan, *id.* § 1112(b)(4)(N), or the plan has terminated based on the occurrence of a condition specified in the plan. *Id.* § 1112(b)(4)(O). The UST must also ensure that the debtor files a final report and closes the case. *In re McLean Square Assocs., G.P.*, 201 B.R. 436, 443 (Bankr. E.D. Va. 1996). The Plaintiffs may not view these continuing "watchdog" duties as beneficial to them personally but the UST serves as the watchdog of the public interest and not as their servant who must account to them for the benefits he confers on them personally. By doing his duty in these and all cases, the UST confers benefits on all parties in interest and the public at large and ensures the integrity of the bankruptcy system.

Next, we are not persuaded by the parties' arguments that the purpose of the 2017 Amendment to build a surplus in the UST Fund of up to $200 million (now $300 million) renders it invalid. (MFG Opposition at 35; SUNE MOL at 38–39.) SunEdison cites to 28 U.S.C. § 589a(a), which provides that monies in the UST Fund go to "purposes in connection with the

operations of the United States trustees" and delineates specific purposes.  (SUNE MOL at 38–39.)  SunEdison argues that the 2017 Amendment increases UST fees for reasons unrelated to the section 589a provisions and is actually collecting far more in user fees than is needed to operate, demonstrating that the fees are not tailored to meet the benefit of the user or the costs of the services.  (*See id.*)  As such, the Plaintiffs argue that the fee increase exceeds the cost of the benefits conferred.  (MFG Opposition at 35.)

Creating a surplus in the UST Fund is not impermissible.  *See Exide*, 611 B.R. at 33 (noting that the tax at issue was not invalid if "a surplus of revenues over outlays in any one year can be offset against actual deficits of past years and perhaps against projected deficits of future years") (quoting *Mass.*, 435 U.S. at 470 n.25).  The concern regarding the insolvency of the UST Fund did not exist until relatively recently because the Pre-Amendment Fees plus the other fees payable into the UST Fund were always enough to create a surplus and ensure that the balance in the UST Fund was sufficient to offset appropriations.  Once filings declined, the surplus became depleted and it was necessary to replenish the UST Fund to ensure that the UST Program continued to be self-supporting and act as an insurance policy against taxpayer support.  If collections exceed costs, the surplus remains part of the UST Fund available for future offsets necessitated by a future imbalance where costs exceed collections.  It does not revert to the U.S. Treasury to fund other governmental operations.

Finally, we conclude that the 2017 Amendment is not an unconstitutional taking because 2% of the revenue collected by the quarterly UST fees is deposited in the U.S. Treasury and not allocated to the UST Fund.  (SUNE MOL at 39.)  SunEdison argues that diverting funds to the U.S. Treasury indirectly benefits every federal expenditure made by the government at the expense of debtors.  (*Id.* at 38.)  Designating 2% of quarterly UST fees for the U.S. Treasury was

intended to offset the cost of eighteen temporary bankruptcy judgeships under PAYGO, another bankruptcy-related expense to be borne by the users rather than the U.S. taxpayers.  Congress provided a rational legislative purpose for this decision that does not amount to a taking of property.  *See Exide*, 611 B.R. at 31 ("The efficient administration of justice is a legitimate legislative purpose and creating new judgeships is rationally related to that purpose.").

Accordingly, we conclude that the increased quarterly fees under the 2017 Amendment do not violate the Takings Clause.

### D.    The 2017 Amendment Does Not Violate The Bankruptcy Clause

Article I § 8 of the Constitution grants Congress the power to establish "uniform Laws on the subject of Bankruptcies throughout the United States."  U.S. CONST. art. I, § 8, cl. 4 (the "Bankruptcy Clause").[19]  A law enacted under the Bankruptcy Clause is properly within Congress's power only if the legislation meets two criteria: (i) the law must be "on the subject of Bankruptcies" and (ii) the law must be uniform throughout the United States.  The Plaintiffs initially argue that the 2017 Amendment is a law "on the subject of Bankruptcies."  Then, comparing the text and implementation of the fees in the UST Districts under section 1930(a)(6)(B) with the text and implementation of the fees in the BA Districts under section 1930(a)(7), the Plaintiffs identify two aspects of non-uniformity.  First, there was a nine-month delay in implementing the amended fees in the BA Districts.  The increased fees took effect in

---

[19]    The Supreme Court recently explained the "unique history" of the Bankruptcy Clause:

The Clause emerged from a felt need to curb the States' authority.  The States, we explained, "had wildly divergent schemes" for discharging debt, and often "refus[ed] to respect one another's discharge orders."  [*Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 365, 377 (2006)]. "[T]he Framers' primary goal" in adopting the Clause was to address that problem—to stop "competing sovereigns[ ]" from interfering with a debtor's discharge. [*Id*. at 373].

*Allen v. Cooper*, 140 S. Ct. 994, 2020 WL 1325815, at *5 (Mar.23, 2020) (first, third, and fourth alterations in original).

the UST Districts for the quarter beginning January 1, 2018 but did not take effect in the BA

Districts until the quarter beginning October 1, 2018.  Second, the amended fees apply to

pending cases in the UST Districts but apply only to cases filed after October 1, 2018 in BA

Districts.

The UST counters that the 2017 Amendment is not a law "on the subject of

Bankruptcies" and instead, was enacted under the Necessary and Proper Clause.  But in any

event, it imposes uniform quarterly fees.  (MFG UST MOL ¶¶ 31–53; SUNE UST MOL ¶¶ 35–

54.)  Further, any non-uniformity in the quarterly fees assessed between the UST Districts under

section 1930(a)(6) and the BA Districts under section 1930(a)(7) is the result of the latter

districts' failure to follow Congress's express instruction to impose fees equal to those imposed

under section 1930(a)(6).  (MFG UST MOL ¶ 55; *see* SUNE UST MOL ¶¶ 41–42.)

For the reasons set forth below, we conclude that the 2017 Amendment is a uniform law

on the subject of bankruptcies within the meaning of the Bankruptcy Clause.

### 1.    The 2017 Amendment is a Law on the Subject of Bankruptcies

As the Supreme Court has observed, "[t]he subject of bankruptcies is incapable of a final

definition."  *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513 (1938) (alteration in

original); *accord Ry. Labor Execs.' Ass'n v. Gibbons*, 455 U.S. 457, 466 (1982).  Although

traditionally viewed as the "subject of the relations between an insolvent or nonpaying or

fraudulent debtor and his creditors, extending to his and their relief," *Wright,* 304 U.S. at 513–

514; *accord Gibbons*, 455 U.S. at 466, these and similar quotes cited by the UST do not establish

a bright line.  "From the beginning, the tendency of legislation and of judicial interpretation has

been uniformly in the direction of progressive liberalization in respect of the operation of the

bankruptcy power."  *Cont'l Ill. Nat'l Bank & Tr. Co. v. Chi., Rock Island & Pac. Ry. Co.*, 294

44

U.S. 648, 668 (1935). "It is true that the original purpose of our bankruptcy acts was the equal distribution of the debtor's property among his creditors; and that the aim of the legislation was to do this promptly. But, the scope of the bankruptcy power conferred upon Congress is not necessarily limited to that which has been exercised," *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 587 (1935) (footnote and citations omitted), and covers "all intermediate legislation, affecting substance and form, but tending to further . . . distribution and discharge." *Id.* at 588 n.18 (citation omitted); *see United States v. Fox*, 95 U.S. 670, 672 (1877) ("[A]s [Congress] is authorized 'to establish uniform laws on the subject of bankruptcies throughout the United States,' it may embrace within its legislation whatever may be deemed important to a complete and effective bankrupt system."). And more recently, the Supreme Court explained that "[t]he Framers would have understood that laws 'on the subject of Bankruptcies' included laws providing, in certain limited respects, for more than simple adjudications of rights in the res." *Katz*, 546 U.S. at 370.

Given the broad approach to the Bankruptcy Clause, it is not surprising that the first and apparently the only time the Supreme Court invalidated a law under the Bankruptcy Clause for lack of uniformity occurred in 1982 in *Gibbons*. 455 U.S. at 469 ("Prior to today, this Court has never invalidated a bankruptcy law for lack of uniformity."); *see Clinton Nurseries, Inc. v. Harrington* (*In re Clinton Nurseries, Inc.*), 608 B.R. 96, 113 (Bankr. D. Conn. 2019) ("Given the flexibility of the Bankruptcy Clause, it is not so astonishing that the Supreme Court has struck down a bankruptcy law on uniformity grounds on only one occasion.") (discussing *Gibbons*), *appeal pending*, No. 19-4067 (2d Cir.). In *Gibbons*, Congress enacted a law (RITA) to protect the displaced employees of the bankrupt Rock Island railroad. RITA gave the employees a priority to the estate's assets over the claims of Rock Island's other creditors and shareholders.

45

455 U.S. at 467.  The Supreme Court first concluded that the enactment, as confirmed by the

legislative history, was within Congress's powers under the Bankruptcy Clause:

> In sum, RITA imposes upon a bankrupt railroad the duty to pay large sums of money to its displaced employees, and then establishes a mechanism through which these "obligations" are to be satisfied.  The Act provides that the claims of these employees are to be accorded priority over the claims of Rock Island's commercial creditors, bondholders, and shareholders.  It follows that the subject matter of RITA is the relationship between a bankrupt railroad and its creditors.  [*See Wright v. Union Cent. Life Ins. Co.*, 304 U.S. at 513–514].  The Act goes as far as to alter the relationship among the claimants to the Rock Island estate's remaining assets.  In enacting RITA, Congress did nothing less than to prescribe the manner in which the property of the Rock Island estate is to be distributed among its creditors.

*Id.*

The Supreme Court struck down the law based on lack of uniformity because it amounted

to a private bill:

> A law can hardly be said to be uniform throughout the country if it applies only to one debtor and can be enforced only by the one bankruptcy court having jurisdiction over that debtor. . . .  By its specific terms, however, RITA applies to only one regional bankrupt railroad, and cannot be said to apply uniformly even to major railroads in bankruptcy proceedings throughout the United States.

*Id.* at 471 (citations omitted).

Congress enacted the 2017 Amendment pursuant to its powers under the Bankruptcy

Clause.  First, in the words of *Gibbons*, it does "nothing less than to prescribe the manner in

which the property of [chapter 11debtors] is to be distributed among [their] creditors."  *Id.* at

467.  The 2017 Amendment grants the UST Program significant rights to the assets of a debtor's

estate.  For the debtor to confirm its plan, it must demonstrate that it has paid all of the fees due

under 28 U.S.C. § 1930 or that the plan provides for the payment of all such fees on the effective

date of the plan.  11 U.S.C. § 1129(a)(12).  In short, section 1930(a)(6) requires chapter 11

debtors to pay pre-confirmation UST fees as an administrative priority expense before it pays its

"commercial creditors, bondholders, and shareholders," and requires reorganized chapter 11

debtors to continue to honor this obligation post-confirmation until the case is closed.  *Victoria Farms*, 38 F.3d at 1530–31 ("The U.S. Trustee program is not only intimately connected to the government's regulation of the *relationship* between creditor and debtor, it also has a concrete effect upon the *relief* available to creditors. . . .[b]ecause [it] reduces the amount of funds that the debtor can ultimately pay to his creditors in the other 48 states.") (emphasis in original);  *Mosaic*, 2020 WL 1808605, at *6 (concluding that the 2017 Amendment is a law "on the subject of Bankruptcies'" because "the UST fee statute creates a claim that arises only in bankruptcy cases, in favor of the UST, an entity that exists solely to participate in bankruptcy cases.  The amount of the fee due to the UST directly impacts distributions to other creditors").  Indeed, the Plaintiffs' contention that the increased fee is adverse to its other creditors is proof that it affects the debtor-creditor relationship by re-dividing the pie.

Second, in addition to *Mosaic*, every bankruptcy court that has addressed the constitutionality of the 2017 Amendment under the Bankruptcy Clause expressly rejected the UST's narrow definition and concluded that the 2017 Amendment is "on the subject of Bankruptcies."  *Clayton Gen.*, 2020 Bankr. LEXIS 842, at *20–21; *Exide*, 611 B.R. at 35; *Clinton Nurseries*, 608 B.R. at 111–12; *Life Partners*, 606 B.R. at 288; *cf. Circuit City*, 606 B.R. at 270–71 (concluding that the 2017 Amendment violates the Bankruptcy Clause); *Buffets*, 597 B.R. at 594 (same).

Third, Congress stated that it was enacting the 2017 Amendment under the Bankruptcy Clause.  Section 1930 was first adopted in 1978 as part of the law establishing the current Bankruptcy Code, which was entitled, "An act to establish a uniform Law on the Subject of Bankruptcies."  Pub. L. No. 95-598, 92 Stat. 2549 (1978).  Congress added subsection (a)(6) to 28 U.S.C. § 1930 in a 1986 amendment to the Bankruptcy Code and related laws contained in

47

Title 28.  1986 Act, Pub. L. No. 99-554, Title I, § 117, 100 Stat. 3088, 3095 (1986).  On January

5, 2011, the House of Representatives adopted an amendment to House Rule XII.  Rule XII,

clause 7(c) requires that, to be accepted for introduction by the House Clerk, all bills (H.R.) and

joint resolutions (H.J.Res.) must provide a document stating "as specifically as practicable the

power or powers granted to Congress in the Constitution to enact the bill or joint resolution."  On

May 1, 2017, the sponsor of the bill containing the 2017 Amendment, Rep. John Conyers, Jr.,

informed Congress that it had the power to enact the 2017 Amendment pursuant to Article 1,

Section 8, Clause 4 of the Constitution—*i.e.*, pursuant to the Bankruptcy Clause.  (*See* Supp.

Siddiqui Decl., Ex. 29 (ECF Doc. # 24-3), Cong. Rec. Vol. 163, No. 74, at H3003 (May 1,

2017), at 3.)

Accordingly, we conclude that the 2017 Amendment is "on the subject of Bankruptcies"

within the meaning of the Bankruptcy Clause.  Our conclusion necessarily rejects the UST's

contention that the 2017 Amendment was enacted by Congress pursuant to its powers under the

Necessary and Proper Clause, not pursuant the Bankruptcy Clause, (MFG UST MOL ¶ 43; MFG

UST Opposition ¶¶ 40–54; SUNE UST MOL ¶¶ 36–39; SUNE UST Opposition ¶¶ 1–5),

because it does not alter a debtor's relationships to its creditors.  (MFG UST Opposition ¶ 43;

SUNE UST MOL ¶ 39.)

> **2.    The 2017 Amendment Applies Uniformly to a Defined Class of Debtors and is Geographically Uniform**

Having concluded that section 1930 was enacted pursuant to the Bankruptcy Clause, we

turn to the parties' primary disagreement—whether the 2017 Amendment is uniform.  Laws

enacted by Congress under the Bankruptcy Clause must apply uniformly to a defined class of

debtors and must be geographically uniform.  *Gibbons*, 455 U.S. at 473; *Hanover Nat'l Bank v.*

*Moyses*, 186 U.S. 181, 188 (1902); *In re Reese*, 91 F.3d 37, 39 (7th Cir. 1996) (Posner, J.)

("[T]he [uniformity] clause forbids only two things. The first is arbitrary regional differences in

the provisions of the Bankruptcy Code. The second is private bankruptcy bills—that

is, bankruptcy laws limited to a single debtor—or the equivalent."). Uniformity does not,

however, mean geographical blindness:

> The uniformity provision does not deny Congress power to take into account differences that exist between different parts of the country, and to fashion legislation to resolve geographically isolated problems. ["]The problem dealt with (under the Bankruptcy Clause) may present significant variations in different parts of the country.["] [*Wright v. Vinton Branch of Mountain Tr. Bank of Roanoke*, 300 U.S. 440, 463 n.7 (1937)]. We therefore agree with the Special Court that the uniformity clause was not intended ["]to hobble Congress by forcing it into nationwide enactments to deal with conditions calling for remedy only in certain regions.["] [*In re Penn Cent. Transp. Co.*, 384 F. Supp. 895, 915 (Reg'l Rail Reorg. Ct. 1974)].

*Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 159 (1974); *accord Gibbons*, 455 U.S. at

469.

The 2017 Amendment applies to all chapter 11 debtors in UST Districts and addresses a

specific geographical problem limited to UST Districts: the depletion of the UST Fund. *Exide*,

611 B.R. at 38 ("The amended fee schedule addresses a geographically isolated problem that is

confined to UST districts, namely the depletion of the UST System Fund. . . . [and] applies with

the same force and effect in every place where the subject of it is found and it is designed to

solve the problem to be remedied.") (footnote omitted); *Clayton Gen.*, 2020 Bankr. LEXIS 842,

at *26–27 (same); *cf. Mosaic*, 2020 WL 1808605, at *7 (concluding that the 98% portion of the

fee destined for the UST Fund is uniform).

We recognize the contrary views based on the delayed implementation of the fee increase

in the BA Districts and the application only to new cases. *See Life Partners*, 606 B.R. at 286

("[T]he 2017 Amendment violates the Uniformity Clause and the Bankruptcy Clause of the U.S.

Constitution because Chapter 11 debtors in U.S. Trustee districts will be forced to pay the higher

49

quarterly fees regardless of when their cases were filed, but Chapter 11 debtors in BA districts will pay the higher quarterly fees only if those debtors filed their bankruptcy cases on or after October 1, 2018.") (footnotes omitted); *Circuit City*, 606 B.R. at 270 ("As the amendment to section 1930(a)(6) does not apply uniformly both to chapter 11 debtors with pending cases in BA districts and to chapter 11 debtors with pending cases in U.S. Trustee districts, it is unconstitutional under the Bankruptcy Clause."); *Buffets*, 597 B.R. at 595 ("The Bankruptcy Judgeship Act of 2017 violated the Constitution when it increased quarterly fees only in the UST program. . . . While the quarterly fees now apply in BA districts from October 1, 2018, forward, the increased fees ostensibly owed by the Reorganized Debtors during the first three quarters of 2018 violate the Uniformity Clause.") (citation omitted).  And as noted, the *Mosaic* court invalidated the 2% portion of the fee destined for the U.S. Treasury as non-uniform because it will be used for national purposes rather than the administration of bankruptcy cases in the UST Districts.  2020 WL 1808605, at * 7.  SunEdison argues that this requires the invalidation of the entire 2017 Amendment and not just the 2%.

      We agree with those cases that have concluded that the 2017 Amendment applies uniformly to debtors in UST Districts to solve the depleting funding unique to the UST Districts. The BA Districts do not support the UST Fund and the UST Fund does not support the BA Program.  The Plaintiffs do not challenge the dual UST/BA system as unconstitutional, and as long as the two regimes co-exist, they will face funding problems that may be unique to only one of them.[20]

---

[20]      Even if consideration of the fees in the BA Districts was relevant, subsections 1930(a)(6) and (a)(7) are uniform.  Subsection 1930(a)(7) states that "the Judicial Conference of the United States may require the debtor in a case under chapter 11 of title 11 to pay fees equal to those imposed by paragraph (6) of this subsection." Notwithstanding the permissive "may," the Judicial Conference recognized this uniformity requirement when it initially imposed fees in the BA Districts, stating that it would impose fees equal to those specified in section 1930(a)(6) "as those amounts may be amended from time to time."  *Exide*, 611 B.R. at 38 (quoting 2001 Judicial Conference Report at 45-46.)  The Judicial Conference may have intended this to be a one-time vote that

That 2% is destined for the U.S. Treasury does not alter our conclusion. While there may be merit in *Mosaic*'s implicit point that taxpayers rather than bankruptcy users should be funding judicial salaries and expenses, we think there are at least three answers requiring us to uphold the 2% fee increase that goes to the U.S. Treasury. First, the funding of judgeships is a problem of national concern and the 2% deposited into the U.S. Treasury uniformly helps defray the additional cost of the temporary judgeships across the country and not just in the UST districts. Second, the entire amount of quarterly fees, including the additional 2% fee of which we speak, is included in the fee increase in BA Districts. The BA quarterly fees are deposited into a special fund of the U.S. Treasury to offset the appropriations for the operation and maintenance of the courts of the United States, *see* 28 U.S.C §§ 1930(a)(7), 1931, and thus benefit all bankruptcy judgeships and not just those in the BA Districts. In other words, both the 2% portion of the UST District quarterly fees and BA Districts quarterly fees support judges nationally and not only in their respective districts. Third, seventeen of the eighteen temporary judgeships covered by the 2% fee increases are assigned to UST Districts and of every $100 in fees paid under section 1930(a)(6)(B), $99.89 either replenishes the depleting UST Fund or is attributable to the cost of the salaries and expenses of the temporary judgeships in UST Districts. The portion of the 2% attributable to the extension of the temporary judgeship in North Carolina, eleven cents out of every $100, is *de minimis* when measured against the funding required in the UST Districts.

---

automatically raised the BA fees whenever Congress raised the UST fees. *Cranberry Growers Cooperative v. Layng*, 930 F.3d 844, 856 n. 51 (7th Cir. 2019). Thus, the Judicial Conference exercised its discretion under section 1930(a)(7) long before enactment of the 2017 Amendments and rendered subsections 1930(a)(6) and (a)(7) uniform in their effect. While the Judicial Conference separately resolved to delay the imposition of the increased fees and limited the increase to new cases, non-uniform implementation of a uniform law does not render the law non-uniform. *Exide,* 611 B.R. at 38.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, we conclude that the Defendants' motions for summary judgment are **GRANTED** and the Plaintiffs' motions for summary judgment are **DENIED.**  We have considered the other arguments made by the parties and conclude that they lack merit.  The Defendants are directed to settle separate judgments in each adversary proceeding that are consistent with this opinion.

As stated at the outset of this Opinion, we certify the decisions herein for immediate appeal to the United States Court of Appeals for the Second Circuit pursuant to 28 U.S.C. § 158(d)(2)(A)(i) and (ii).

Dated:  New York, NY
         April 24, 2020

_____/s/ *Stuart M. Bernstein*_____
            Stuart M. Bernstein
        United States Bankruptcy Judge

_____/s/ *Martin Glenn*_____
            MARTIN GLENN
        United States Bankruptcy Judge